# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

DASH INTERACTIVE, INC.
a Texas Corporation,

      Plaintiff,

v.

CASE NO: 6:10-cv-179-Orl-31KRS

MYMEDLAB.COM, INC.
d/b/a MYMEDLAB, INC.,
a Delaware Corporation,

      Defendant.
_____/

## COMPLAINT FOR COPYRIGHT INFRINGEMENT, BREACH OF CONTRACT AND TORTIOUS INTERFERENCE WITH TRIAL BY JURY REQUESTED

Plaintiff, DASH INTERACTIVE, INC., ("DASH" or "Plaintiff"), a Texas corporation, by and through its undersigned attorneys, hereby sues Defendant, MYMEDLAB.COM, INC. d/b/a MYMEDLAB, INC., ("MYMEDLAB" or "Defendant"), a Delaware corporation and as grounds states:

### PARTIES, JURISDICTION AND VENUE

1. Plaintiff, DASH, is a Texas Corporation duly incorporated under the laws of the State of Texas with a principal place of business at 233 Saddleback Road, Austin, Texas 78737. Plaintiff has consented to jurisdiction in this Court. *See* Exhibit "A," Software and Services Purchase Agreement at §2(c).

2. Defendant, MYMEDLAB, is a Delaware Corporation duly incorporated under the laws of the State of Delaware with a place of business at 2401 South Jackson Ave., Joplin, Missouri, 64804 and has consented to jurisdiction in this Court. *See* Exhibit "A" at §2(c).

3. This action is brought by Plaintiff seeking an injunction and damages for Defendants' willful and deliberate infringement of Plaintiff's copyright in violation of 17 U.S.C. §501 *et seq*; Defendant's breach of the Software and Services Purchase Agreement; Defendant's Breach of the Collocation Hosting Agreement; and Defendant's tortious interference with Plaintiff's advantageous business relationship.

4. This Court has subject matter jurisdiction over the copyright infringement claim under 28 U.S.C. § 1331 and 1338(a) and over the breach of contract claims and tortious interference claim under 28 U.S.C. §1338(b) and 28 U.S.C. §1367(a) and the principles of supplemental jurisdiction.

5. This Court has personal jurisdiction over Defendant because Defendant has consented to jurisdiction in this Court and conducts substantial and not isolated business activities in this state pursuant to Florida Statute §48.193(2).

6. Venue properly lies in this judicial district under 28 U.S.C. §1391(c) and 1400(a), and in this Division pursuant to Local Rule 1.02(c) of the United States District Court for the Middle District of Florida.

7. All conditions precedent to the institution and maintenance of this action has occurred or has been performed.

## STATEMENT OF FACTS AS TO ALL COUNTS

8. DASH has been in the business of software development, network security and graphic design since 1997.

9. On January 16, 2008, DASH and MYMEDLAB, entered into a Software and Service Purchase Agreement ("SASPA") wherein DASH designed a website for MYMEDLAB and MYMEDLAB was to purchase the services of Dash related to development and design of the website as well as the software associated the website. *See* Exhibit "A."

10. As part of the SASPA, MYMEDLAB was granted an irrevocable perpetual license to use the Software and Intellectual Property rights once MYMEDLAB executed the SASPA and paid the initial $25,000. *See* Exhibit "A" at §4(a).

11. MYMEDLAB paid the initial $25,000 on January 31, 2008 and was thus given a perpetual license to use the Software created by DASH.

12. Another Section of the SASPA gave MYMEDLAB an assignment of all rights, title and interest in the Software once MYMEDLAB executed the SASPA and paid the initial $25,000. *See* Exhibit "A" at §4(b). However, the ownership of the Software and intellectual property was to revert back to DASH 120 days from the execution of the SASPA, on May 16, 2008, if MYMEDLAB exercised its right to Opt-Out of the SASPA. *Id.*

13. Under the "Opt-Out" Section, if MYMEDLAB was not interested in making an outright purchase of the Software, but would rather have a non-exclusive perpetual license, it could Opt-Out of the Agreement. It was the obligation of MYMEDLAB to notify DASH in writing of its desire to exercise its right to Opt-Out on or before the 110th day after the Effective Date of the SASPA. Thus, if MYMEDLAB was interested in Opting-Out of the SASPA it was required to provide written notice of such to DASH by May 6, 2008. *See* Exhibit "A" at §9(d).

14. Under the Consideration Section of the SASPA, unless MYMEDLAB opts out of the SASPA as provided in §9(d), MYMEDLAB was required to pay $400,000 to DASH in the following manner:

    a.    **Cash** - $200,000 in cash wherein $25,000 was paid on January 31, 2008, $25,000 on March 31, 2008, $25,000 on April 30, 2008 and in $25,000 increments on the last business day of each months thereafter until September 30, 2008. *See* Exhibit "A" at §9(a).

    b.    **Equity** - MYMEDLAB was to issue DASH 2% of the outstanding shares of the company which were to be common stock at its current value of per share for a total value of no less than $100,000. *See* Exhibit "A" at §9(b).

    c.    **PHR Royalty** – for the first 100,000 PHR using the software, MYMEDLAB was to pay DASH $1 per PHR, which was due the last business day of each month. MYMEDLAB guaranteed that DASH would receive $100,000 in PHR royalty payments on or before the first anniversary of the Effective Date of the SASPA. *See* Exhibit "A" at §9(c).

15. MYMEDLAB paid $25,000 on January 31, 2008, $25,000 on March 31, 2008 and $15,000 of the third payment that was due on April 30, 2008. However, no further payments were made, no stock was issued and no royalties were paid in the amount of $1/PHR as specified in Sections 9(a) – (c) of the SASPA.

16. If MYMEDLAB chose not to Opt-Out of the SASPA or did not follow the guidelines specified in §9(d), then MYMEDLAB was required to make all payments specified in Sections 9(a) – (c) totaling $400,000. After making such payments, MYMEDLAB would be the owner of the Software and Intellectual Property.

17. If MYMEDLAB chose to Opt-Out of the SASPA and did so on time and in writing as specified in §9(d), then all intellectual property rights were to revert back to DASH on May 16, 2008 and MYMEDLAB was required to pay $1/PHR fee for all maintenance and upgrades of the PHR until all or substantially all of the business or assets of MYMEDLAB were sold, whether by merger sale of stock, sale of assets, or otherwise as well as the hosting fees until May 01, 2010 discussed in more detail below at paragraph twenty-one (21). *See* Exhibit "A" at §9(d).

18. On May 9, 2008, three (3) days after the May 6, 2008 deadline, MYMEDLAB contacted DASH and attempted to Opt-Out of the SASPA. That same day, DASH responded stating that the Opt-Out notice was three days late and requested that MYMEDLAB honor the terms of the Agreement. MYMEDLAB responded stating that they had notified Dash on more than one occasion that they were having trouble finding investors and DASH responded again disagreeing that MYMEDLAB notified DASH of its option to opt-out and vehemently disagreeing that any such opt-out was in writing or was done in a timely fashion. Attached as Exhibit "B" is a true and correct copy of the correspondence between MYMEDLAB and DASH.

19. MYMEDLAB failed to exercise its right to opt-out in the manner and within the timeframe specified in Section 9(d) of the SASPA. Therefore, MYMEDLAB is required to pay DASH the additional $335,000 for the purchase of the Software and Intellectual Property as specified in Sections 9(a) –(c) of the SASPA.

20. In the alternative, if MYMEDLAB timely opted out, DASH is the owner of the Software and Intellectual Property and MYMEDLAB has violated DASH's intellectual property rights by copying the Software and website design as well as creating a derivative of the Work without DASH's permission.

21. Pursuant to the parties' Collocation Hosting Agreement ("Hosting Agreement"), which is attached as Exhibit "D" to the SASPA, MYMEDLAB was and is required to pay DASH the sum of $3,800 plus taxes and service fees ("Hosting fees") each month until May 01, 2010 in association with DASH hosting MYMEDLAB's website. A copy of the Collocation Hosting Agreement is attached as Exhibit "C" hereto.

22. MYMEDLAB paid the allotted $3,800 plus taxes and service fees for the months of January 2008 – May of 2008, but failed to pay the Hosting Fees for the months of June 2008 until May of 2010 as required in the Agreement.

23. On or around August 21, 2008 MYMEDLAB took its website off DASH's server and moved it to another server, hosted by Linode.

24. Pursuant to Section 10 of the SASPA, MYMEDLAB is prohibited from moving, copying, shipping or giving access to a third party, or hosting with another company, until after such time as consideration is paid in full subject to the opt-out provision. *See* Exhibit A at §10.

25. MYMEDLAB has not paid in full subject to the opt-out provision and was therefore prohibited from copying and moving the website to another server, hosted by another company and giving access to a third party.

26. In addition, prior to and during the course of the parties business and contractual relationship, MYMEDLAB became aware that DASH had an advantageous and existing business relationship with a diagnostic company known as Lab Corp.

27. On or around July, 2008, MYMEDLAB, through its officers and directors, and with their knowledge and ratification, contacted Lab Corp and wrongfully advised Lab Corp that DASH was attempting to sell software owned by MYMEDLAB.

28. MYMEDLAB made these accusations knowing that they were false in a willful attempt to disrupt, destroy and interfere with DASH's ongoing business relationship with Lab Corp.

29. Pursuant to the SASPA, DASH created and is the author and owner of an original software program and website (hereinafter "the Work"), which is wholly original to DASH and which was created for MYMEDLAB's use.

30. On December 8, 2009, as the author and owner, DASH filed for a Copyright Registration for the Work and such application was registered with the Copyright Office with an effective date of registration of December 8, 2009 (TX 7-016-588) ("Copyright Registration"). A copy of the Certificate of Registration is attached hereto and incorporated herein as Exhibit "D."

31. On January 7, 2010 DASH filed a Supplemental Registration correcting and amplifying certain aspects of its Copyright Registration. A copy of the Supplemental Registration form is attached hereto and incorporated herein as Exhibit "E."

32. Plaintiff has marked the Work with a copyright notice and has complied with all of the formalities under the copyright laws of the United States.

33. If Defendant timely opted-out of the SASPA, it is only a licensee of the Software and therefore cannot copy and move the Software and website to another server, create a derivative work without DASH's permission or interfere with DASH's advantageous business relationships by claiming that it is the owner of the software.

34. MYMEDLAB had access to the Work as the front end code was publicly available via www.mymedlab.com.

35. Without authorization from DASH, MYMEDLAB copied the Work and is using, displaying and creating derivative works of the Work.

36. On information and belief, MYMEDLAB copied wholesale the front end code of the website and then recreated the back end by using former employees of DASH's that had worked on the website for DASH previously. On information and belief, MYMEDLAB consciously sought to infringe the Work by soliciting these employees to violate their nondisclosure agreements with DASH.

37. David Clymer, the President of MYMEDLAB, admitted in a deposition that MYMEDLAB took the front end code from DASH. Attached as Exhibit "F" is a true and correct copy of an excerpt from the deposition transcript of David Clymer, *See* page 42, lines 7-11.

38. The original work created by DASH and filed with the Copyright Office, which is attached as Exhibit "G" to this Complaint is substantially similar to the derivative created by MYMEDLAB attached as Exhibit "H."

39. On information and belief the source code that MYMEDLAB used to create the derivative is also substantially similar.

40. All conditions precedent to the institution and maintenance of this action has occurred or has been performed.

41. Plaintiff has retained the undersigned attorneys to represent it in this action and have agreed to pay them a reasonable fee for their services.

42. Plaintiff pleads each count below in the alternative since a determination of the status of the contract is required to ascertain which count or counts are actionable.

## COUNT I
### Copyright Infringement

43. Plaintiff incorporates by reference all of the allegations of Paragraphs 1 through 42 of this Complaint as though fully set forth herein.

44. This is an action for copyright infringement pursuant to 17 U.S.C. §501. Plaintiff has complied with all formalities under the copyright laws of the United States in applying for a copyright registration for the Work.

45. MYMEDLAB had access to the Work.

46. Without authorization from Plaintiff, MYMEDLAB copied and/or took a copy of the Work and is using and/or distributing the Work in conjunction with providing its products and/or services under the business name MYMEDLAB, INC.

47. MYMEDLAB's intentional use of the Work is willful and without authorization from Plaintiff, and is a direct violation of Plaintiff's copyright rights.

48. The aforesaid acts of MYMEDLAB constitute infringement of the Work and violate 17 U.S.C. §501.

49. Plaintiff has been and continues to be damaged by MYMEDLAB's infringement.

50. Plaintiff has no adequate remedy at law.

51 MYMEDLAB's copyright infringement has caused, and will continue to cause, irreparable injury to Plaintiff if MYMEDLAB is not permanently enjoined by this Court from further violation of Plaintiff's copyright.

52 Plaintiff is entitled to recover all infringing copies of the Work that may be in MYMEDLAB's possession or under its control or that said infringing copies be destroyed under a Writ of Destruction issued under 17 U.S.C. §503, whichever shall seem to this Court to be most just and proper.

53 Plaintiff is further entitled to recover the actual damages sustained in consequence of MYMEDLAB's willful and wrongful conduct, in an amount to be determined.

### COUNT II
### Breach of Software and Services Purchase Agreement

54 Plaintiff incorporates by reference all of the allegations of Paragraphs 1 through 42 of this Complaint as though fully set forth herein.

55 Defendant has breached the SASPA Agreement as described in more detail in paragraphs eight (8) through twenty (20) above, in the following manners:

    a.    Defendant failed to Opt-Out of the SASPA in a timely manner pursuant to Section 9(d) of the SASPA.

    b.    Defendant failed to pay the remaining $135,000 in cash that was due pursuant to Section 9(a) of the SASPA.

    c.    Defendant failed to issue 2% of the outstanding MYMEDLAB common stock, amounting to a value of no less than $100,000 pursuant to Section 9(b) of the SASPA.

    d.    Defendant failed to pay $1/PHR due on the last business day of each month pursuant to Section 9(c) of the SASPA,

    e.    Defendant violated Section 10 of the SASPA by moving and copying the Software as well as giving access to a third party prior to the final payment of $335,000 due to DASH pursuant to Section 9 of the SASPA.

    f.    Defendant violated Section 13 of the SASPA by transferring the website to another hosting company prior to May 01, 2010 the end date of the Collocation Hosting Agreement thus depriving Plaintiff of the hosting fees for a period of twenty-three (23) months.

56    As a direct and proximate result of MYMEDLAB's breaches of the SASPA, DASH has been damaged.

## COUNT III
### Breach of Collocation Hosting Agreement

57.    Plaintiff incorporates by reference all of the allegations of Paragraphs 1 through 42 of this Complaint as though fully set forth herein.'

58.    Defendant has breached the Hosting Agreement as described in more detail in paragraphs twenty-one (21) through twenty-four (24) above, in the following manners:

    a.    Defendant failed to pay the $3,800 per month (plus any applicable taxes and service fees) for the months of June 2008 until May of 2010.

b.   Defendant transferred the website to another hosting company on August 21, 2008 which is in violation of the Hosting Agreement, which states that the agreement is effective until May 01, 2010 thus depriving Plaintiff hosting fees for a period of twenty-three (23) months.

59.   As a direct and proximate result of MYMEDLAB's breaches of the Hosting Agreement, DASH has been damaged.

## COUNT IV
### Tortious Interference

60.   Plaintiff incorporates by reference all of the allegations of Paragraphs 1 through 42 of this Complaint as though fully set forth herein.

61.   Prior to and during the course of the parties business and contractual relationships, MYMEDLAB became aware that DASH had an advantageous and existing business relationship with a diagnostic company known as Lab Corp.

62.   On or around July of 2008, MYMEDLAB, by and through its officers and directors, and with their knowledge and ratification, contacted Lab Corp and wrongfully advised Lab Corp that DASH was attempting to sell Lab Corp software owned by MYMEDLAB.

63.   MYMEDLAB made these accusations knowing that they were false or with reckless disregard for their truthfulness and did so as a willful attempt to disrupt, destroy and interfere with DASH's ongoing business relationship with Lab Corp.

64.   As alleged in paragraphs ten (10) and eleven (11) above, MYMEDLAB is a licensee of the Software, not the owner, and therefore does not have the right to prevent DASH from selling the software, or something similar thereto to other companies.

65.   As a direct and proximate result of MYMEDLAB's tortious interference with DASH's ongoing business relationship with Lab Corp, DASH has suffered damages.

**WHEREFORE**, Plaintiff prays for Judgment against MYMEDLAB as follows:

a. That Defendant MYMEDLAB be permanently enjoined from infringing the Work in any manner, including without limitation, doing or authorizing, directly or indirectly, any of the following activities without authority under the copyright: copying, duplicating, reproducing, distributing, selling, exchanging, lending, supplying for use by others; and from offering to copy, duplicate, reproduce, sell, exchange, lend, supply for use by others the Work; and from in any manner infringing or contributing to or participating in the infringement by others of the copyright in the Work and from acting in concert with, aiding and abetting others to infringe said copyright in any way;

b. That MYMEDLAB tender to Plaintiff all infringing copies of Plaintiff's copyrighted website and/or Software that may be in their possession or under their control or that said infringing copies be destroyed under a Writ of Destruction issued under 17 U.S.C. §503, whichever shall seem to this Court to be most just and proper.

c. That MYMEDLAB be required to pay the Plaintiff:

(1) The actual damages suffered by Plaintiff as a result of the infringement of Plaintiff's copyright, and any profit that is not taken into account in computing actual damages;

(2) Damages in the amount of $335,000 for past payments due to DASH under Sections 9(a)-(c) of the SASPA;

(3) Damages in the amount of $1/PHR from January 16, 2008 until all or substantially all of the business or assets of MYMEDLAB are sold, whether by merger sale of stock, sale of assets;

(4) Damages in the amount of $3,800 per month (plus any applicable taxes and service fees) totaling $4,115.50 per month for the months of June 2008 through May 2010

amounting to a total of $94,656.50.

    (5)    Attorneys fees and costs pursuant to Section 15(c) of the SASPA;

    (6)    Pre-Judgment and Post-Judgment interest; and

    (7)    Such further relief as this Court deems just and proper.

## REQUEST FOR JURY TRIAL

Plaintiff requests a trial by jury.

DATED this 27th day of January, 2010

                      Respectfully Submitted,

                      BEUSSE WOLTER SANKS
                         MORA  & MAIRE, P.A.
                      390 N. Orange Avenue, Suite 2500
                      Orlando, FL  32801
                      Telephone:   (407) 926-7700
                      Facsimile:    (407) 926-7720
                      Email: tsanks@iplawfl.com
                      Email: adavis@iplawfl.com
                      Attorneys for Plaintiff

                      _____
                      Terry M. Sanks
                      Florida Bar No. 154430
                      Amber N. Davis
                      Florida Bar No. 0026628